# United States Court of Appeals
## For the First Circuit

No. 08-2567

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL DiTOMASSO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Boudin, Selya and Gajarsa,*

Circuit Judges.

Kevin J. Fitzgerald, Assistant Federal Public Defender, for appellant.
Milind M. Shah, Assistant United States Attorney, with whom Peter F. Neronha, United States Attorney, was on brief, for appellee.

September 22, 2010

*Of the Federal Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.  The Sex Offender Registration and Notification Act (SORNA), Pub. L. No. 109-248, tit. I, §§ 101-155, 120 Stat. 587, 590-611 (2006), fashioned a national scheme for the registration of sex offenders.  This appeal requires us to decide a question about that scheme that has divided the courts of appeals: When did SORNA's registration requirements become operative with respect to a previously convicted sex offender who traveled interstate and failed to register between SORNA's effective date and the promulgation of an interim rule clarifying SORNA's reach?  After determining that the registration requirements became generally operative at the time when SORNA was signed into law and rejecting a series of constitutional challenges to the registration scheme, we affirm the defendant's conviction for failure to register.

## I.  BACKGROUND

Because this appeal follows a conviction predicated on a guilty plea, we draw the facts from the change-of-plea colloquy, the uncontested portions of the presentence investigation report, and the sentencing transcript.  See, e.g., United States v. Cintrón-Echautequi, 604 F.3d 1, 2 (1st Cir. 2010); United States v. Dietz, 950 F.2d 50, 51 (1st Cir. 1991).

Defendant-appellant Michael DiTomasso was convicted of sex offenses in Massachusetts in 1995.  Upon his release from prison, Massachusetts law required him to register as a sex

-2-

offender, and he did so. He was on notice that, if he moved out of state, he would have to register as a sex offender in the new venue.

The defendant kept his Massachusetts registration current through the fall of 2006. In February of 2007, he moved to Woonsocket, Rhode Island,[1] and took up residence there. Despite this change of domicile, he did not register as a sex offender in Rhode Island.

On March 27, 2007, a local police officer informed the defendant that Rhode Island law required him to register. The officer told him that he should report to the police station for that purpose within the week. The defendant did not comply.

On April 4, 2007, the defendant was arrested for failing to register as a sex offender in Rhode Island. Spurred by this arrest, a federal grand jury handed up an indictment charging the defendant with failing to register under SORNA. See 18 U.S.C. § 2250; 42 U.S.C. § 16913. The indictment alleged that the defendant's culpable failure to register began in March 2007 and continued through April 4, 2007 (a period that followed his interstate travel in February of 2007).

The defendant moved to dismiss the indictment, arguing that SORNA did not apply to him and that, in all events, the law's

---

[1] The record does not indicate an exact date, but the government, at least provisionally, acknowledges that the defendant's interstate travel occurred before February 27, 2007.

-3-

registration requirements were invalid. The government opposed the motion. The district court, in a thoughtful rescript, rejected the defendant's challenge. United States v. DiTomasso, 552 F. Supp. 2d 233, 248 (D.R.I. 2008). The court ruled that SORNA applied to the defendant from and after its effective date because the law imposed a "general obligation on sex offenders to register." Id. at 241. The court simultaneously rebuffed the defendant's other challenges. Id. at 247-48.

The defendant elected to enter a conditional guilty plea, Fed. R. Crim. P. 11(a)(2), preserving his right to appeal the denial of his motion to dismiss. The district court sentenced him to serve thirty months in prison. This timely appeal ensued.

## II. ANALYSIS

We first consider the defendant's principal argument that SORNA did not apply to him when he committed the alleged offense. We then address his other constitutional claims.

### A. **Applicability of the Registration Requirements**.

The defendant pleaded guilty to violating 18 U.S.C. § 2250(a). Among other things, this section imposes criminal penalties when a person required to register as a sex offender under SORNA knowingly fails to register after traveling in interstate commerce. For SORNA purposes, a "sex offender" is "an individual who was convicted of a sex offense." 42 U.S.C. § 16911(1). The defendant concedes that he falls within this

taxonomy.  To understand his argument that SORNA's registration requirements, 42 U.S.C. § 16913(a), (c), nonetheless do not apply to him, we must understand the architecture of the statutory scheme.

The registration requirements are laid out in section 16913, which provides:

> (a) In general
>
> A sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student.  For initial registration purposes only, a sex offender shall also register in the jurisdiction in which convicted if such jurisdiction is different from the jurisdiction of residence.
>
> (b) Initial registration
>
> The sex offender shall initially register —
>
> (1) before completing a sentence of imprisonment with respect to the offense giving rise to the registration requirement; or
>
> (2) not later than 3 business days after being sentenced for that offense, if the sex offender is not sentenced to a term of imprisonment.
>
> (c) Keeping the registration current
>
> A sex offender shall, not later than 3 business days after each change of name, residence, employment, or student status, appear in person in at least 1 jurisdiction involved pursuant to subsection (a) and inform that jurisdiction of all changes in the information required for that offender in the sex offender registry.  That jurisdiction

shall immediately provide that information to all other jurisdictions in which the offender is required to register.

(d) Initial registration of sex offenders unable to comply with subsection (b)

The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b).

42 U.S.C. § 16913.[2]

SORNA became law on July 27, 2006. On February 28, 2007, the Attorney General, acting pursuant to the authority explicitly granted to him in section 16913(d), promulgated an interim rule "to eliminate any possible uncertainty about the applicability of [SORNA's] requirements . . . to sex offenders whose predicate convictions predate the enactment of SORNA." Applicability of the Sex Offender Registration and Notification Act, 72 Fed. Reg. 8894, 8896 (Feb. 28, 2007). This rule declares that SORNA's requirements "apply to all sex offenders, including sex offenders convicted of

---

[2] There is a discrepancy between the United States Code and the United States Code Annotated with respect to the language of 42 U.S.C. § 16913. The version printed in the United States Code Annotated contains the words "of this section" in subsections (c) and (d) when cross-referencing other subsections of the provision, but the version printed in the United States Code does not. We quote here the version in the United States Code, as it is the official version of the statute. This difference, however, has absolutely no bearing on the substance of our discussion.

the offense for which registration is required prior to the enactment of [SORNA]." 28 C.F.R. § 72.3.

The courts of appeals have disagreed about the meaning and effect of this statutory/regulatory mosaic. See Carr v. United States, 130 S. Ct. 2229, 2234 n.2 (2010) (noting circuit split). The disagreement centers on subsection (d), which contains two pertinent clauses. The question boils down to whether the first clause, stating that "[t]he Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter or its implementation in a particular jurisdiction," gave the Attorney General authority to determine the applicability of SORNA to all persons who stood convicted of sex offenses on SORNA's effective date or, alternatively, as indicated in the following clause of subsection (d) ("to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b)"), to determine its applicability only as to specific subsets of those offenders.

Some courts have determined, often over emphatic dissents, that the statute unambiguously gave the Attorney General the authority to determine SORNA's applicability to all persons previously convicted of sex offenses. See, e.g., United States v. Cain, 583 F.3d 408, 414-15 (6th Cir. 2009); United States v. Hatcher, 560 F.3d 222, 228 (4th Cir. 2009); United States v.

-7-

<u>Madera</u>, 528 F.3d 852, 858 (11th Cir. 2008) (per curiam).  If this view is correct, SORNA did not apply to previously convicted sex offenders until the Attorney General promulgated the interim rule. See <u>Hatcher</u>, 560 F.3d at 229.

Other courts, deeming the statute ambiguous, have construed it to signify that the Attorney General only had authority to determine SORNA's applicability to previously convicted sex offenders who were unable initially to register under SORNA.[3]  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Hinckley</u>, 550 F.3d 926, 930, 932-33, 935 (10th Cir. 2008), <u>cert. denied</u>, 129 S. Ct. 2383 (2009); <u>United States</u> v. <u>May</u>, 535 F.3d 912, 918-19 (8th Cir. 2008), <u>cert. denied</u>, 129 S. Ct. 2431 (2009); <u>see</u> <u>also</u> <u>Cain</u>, 583 F.3d at 424 (Griffin, J., dissenting); <u>Hatcher</u>, 560 F.3d at 229 (Shedd, J., dissenting).  Under this view, registered sex offenders who had a state-law duty to keep their registrations current on SORNA's effective date became subject to a new obligation to register for federal purposes when, thereafter, they moved to a different state. See <u>May</u>, 535 F.3d at 919.  If this view is correct, SORNA applied to previously convicted sex offenders as of the date of its enactment.

---

[3] An example would be an offender who had been convicted of a sex offense but was not required to register (or could not register) under any state law prior to SORNA's enactment.  <u>See</u> 72 Fed. Reg. at 8896.

The defendant urges us to follow the Fourth, Sixth, and Eleventh Circuits and hold that SORNA's registration requirements did not apply to him when he traveled interstate. In his view, the plain language of subsection (d) delegates to the Attorney General sole authority to determine whether SORNA applies to any or all sex offenders with preexisting convictions and, inasmuch as the Attorney General did not exercise this authority until February 28, 2007 (when he promulgated the interim rule), convicted sex offenders who traveled before that date and failed to register did not violate SORNA's registration requirements. Any other reading of the statute, he contends, would transgress the Ex Post Facto Clause, U.S. Const. art. I, § 9, cl. 3, which prohibits "punishment for an act which was not punishable at the time it was committed." Weaver v. Graham, 450 U.S. 24, 28 (1981) (quoting Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 325-26 (1867)). Because this claim presents a question of statutory construction, we afford de novo review. United States v. Leahy, 473 F.3d 401, 405 (1st Cir. 2007).

"Statutory interpretation begins with the language of the statute." Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 8 (1st Cir. 2007). Absent some indication that the words of a statute have an "exotic meaning," we normally assume that the language employed carries its usual and ordinary meaning. SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010) (en banc). If the

meaning of the text is plain, we generally need go no further. In re Hill, 562 F.3d 29, 32 (1st Cir. 2009).

This general rule, like virtually every general rule, admits of exceptions. One such exception is pertinent here. No less an authority than the Supreme Court has warned that "the meaning of statutory language, plain or not, depends on context." Holloway v. United States, 526 U.S. 1, 7 (1999) (quoting Brown v. Gardner, 513 U.S. 115, 118 (1994)); see also Davis v. Mich. Dep't of Treas., 489 U.S. 803, 809 (1989) ("[W]ords of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

The language at issue here — the first clause of subsection (d) — states that "[t]he Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter . . . ." 42 U.S.C. § 16913(d). Although this language might appear straightforward if read in a vacuum, a mechanical reading of it as applying to all previously convicted sex offenders would wrest it from its contextual moorings. Taking into account the context in which this provision operates, we do not believe that such a mechanical construction is what Congress intended.

In our judgment, a different canon of construction dominates the interpretive landscape in this instance. When congressional intent is clear and a statute plausibly can be read

to effectuate that intent, that reading must prevail over a more semantically correct reading of the statutory language. See, e.g., In re Hill, 562 F.3d at 32 ("[P]lain meaning sometimes must yield if its application would bring about results that are either absurd or antithetical to Congress's discernible intent."). We explain below why we think that this is such a case.

In the absence of a clear congressional direction to the contrary — and there is none here — "a law takes effect on the date of its enactment." Gozlon-Peretz v. United States, 498 U.S. 395, 404 (1991). SORNA was signed into law on July 27, 2006. Subsection (a), which requires that sex offenders "register, and keep the registration current," 42 U.S.C. § 16913(a), unarguably became law at that time. The same is true of subsection (b), which describes SORNA's initial registration requirements, id. § 16913(b), and of subsection (c), which demands the updating of registration information within three business days of a change of name, residence, employment, or student status, id. § 16913(c). Thus, but for subsection (d), any argument that the section cannot operate in advance of action by the Attorney General would be absurd.

Based on this analysis, we disagree with the Sixth Circuit's reading of subsections (a)-(c). See Cain, 583 F.3d at 414-15 ("Congress did not enact language providing a default position . . . the statute does not read 'the Attorney General

shall have the authority to waive the applicability of the requirements of this subchapter.'"). Subsections (a), (b), and (c) contain clear and directory language, and when statutory language is written as a clear directive, the rule is that, in the absence of limiting language, the statute is effective as of the date of its enactment. See United States v. Shenandoah, 595 F.3d 151, 157-58 (3d Cir.), cert. denied, 130 S. Ct. 3433 (2010). There is no limiting language here.

Subsection (d) is anything but a clear direction to the contrary. Courts holding otherwise have read the language of this subsection as giving the Attorney General the exclusive authority to apply the registration requirements to any and all previously convicted sex offenders. See, e.g., Hatcher, 560 F.3d at 227. To arrive at this interpretation, those courts have surgically removed subsection (d) from the rest of the section and have read its text in a vacuum. See, e.g., Cain, 583 F.3d at 414. We are unwilling to take so struthious an approach. Cf. United States v. Heirs of Boisdore, 49 U.S. (8 How.) 113, 122 (1849) (explaining that "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy"). Context must be considered — and contextual awareness is especially important when interpreting the provisions of a comprehensive regulatory scheme. See, e.g., FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000)

-12-

(directing courts to interpret such a statute "as a symmetrical and coherent regulatory scheme" (quoting <u>Gustafson</u> v. <u>Alloyd Co.</u>, 513 U.S. 561, 569 (1995))). Congress intended SORNA to function as such a scheme. <u>See</u> 42 U.S.C. § 16901 (stating that Congress sought to "establish[] a comprehensive national system for the registration of [sex] offenders"); <u>see also</u> <u>May</u>, 535 F.3d at 919-20 (discussing Congressional intent to create regulatory scheme when enacting SORNA).

When viewed as a part of a seamless regulatory scheme, subsection (d) has a distinct office: it appears to reflect Congress's recognition that specific applications of the registration requirements to previously convicted sex offenders may have unintended consequences. Thus, subsection (d) allows — but does not compel — the Attorney General to narrow SORNA's sweep if and to the extent that he concludes that specific situations invite such narrowing. Several contextual considerations support this view.

First, it cannot be gainsaid that Congress enacted SORNA to "establish[] a comprehensive national system for the registration of [sex] offenders." 42 U.S.C. § 16901. The Act defines a "sex offender" as "an individual who <u>was</u> convicted of a sex offense." <u>Id.</u> § 16911(1) (emphasis supplied). It is significant that this past-tense definition makes no exceptions. <u>See</u> <u>Hatcher</u>, 560 F.3d at 232 (Shedd, J., dissenting) (concluding

-13-

that this past-tense usage "expressly sweeps persons . . . convicted of sex offenses prior to SORNA's enactment within the statute's scope"); see also Carr, 130 S. Ct. at 2236 (noting importance of Congress's choice of verb tense in interpreting statute's temporal reach).

Second, the structure of section 16913 strongly suggests that this past-tense usage is not a scrivener's error. The office of subsection (a) is to ensure the registration of all sex offenders. Congress spoke with conspicuous clarity in making subsection (a) all-encompassing: "A sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides . . . ." 42 U.S.C. § 16913(a). By the same token, neither subsection (b), which elaborates on initial registration requirements, nor subsection (c), which delineates continuing registration requirements, distinguishes between pre-SORNA and post-SORNA sex offense convictions. See id. § 16913(b)-(c); see also Hinckley, 550 F.3d at 944 (Gorsuch, J., concurring).

Third, SORNA was tailored to fashion a comprehensive regulatory scheme. 42 U.S.C. § 16901. Construing subsection (d) to exempt a broad swath of the convicted sex offender population — indeed, the entirely of it, until the Attorney General acts — would fit uncomfortably with the remainder of the Act.

Fourth, the title of subsection (d) specifies that the authority it describes relates to the "[i]nitial registration of

-14-

sex offenders unable to comply with subsection (b)." This language clearly indicates that the scope of the authority conferred upon the Attorney General by subsection (d) is limited to prescribing rules governing those offenders unable to comply with SORNA's initial registration requirements under subsection (b) and not pre-SORNA sex offenders more generally. See Hinckley, 550 F.3d at 933.

Some of the courts that have endorsed a contrary construction of subsection (d) have disregarded the title of the subsection based on the principle that courts only look to the title of a law in the event of ambiguity. See, e.g., Cain, 583 F.3d at 416; Hatcher, 560 F.3d at 226. But that principle does not pertain where, as here, an inquiring court's primary task is to place a statute in context before attempting to construe it. Thus, we do not use the title to "undo or limit what the text makes plain." Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co., 331 U.S. 519, 529 (1947).

Fifth, the language of the second clause of subsection (d), which states that the Attorney General shall have the authority "to prescribe rules . . . for other categories of sex offenders who are unable to comply with subsection (b)," informs our understanding of the first clause of subsection (d). The second clause suggests that the authority conferred by the first clause of subsection (d) was intended to extend only to those previously convicted offenders who were unable to comply with

-15-

subsection (b), and not to previously convicted offenders more generally. The use of the word "other" in the second clause is most naturally read to indicate Congress's contemplation that the "sex offenders convicted before the enactment of this chapter" referenced in the first clause will form one subset of "offenders unable to comply with subsection (b)." Cf. United States v. Ven-Fuel, Inc., 758 F.2d 741, 751-52 (1st Cir. 1985) ("All words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous."). This interpretation of the interaction between the two clauses of subsection (d) leaves intact the registration requirements articulated in subsection (a) and limits the applicability of subsection (d) to those offenders unable to comply with the requirements of subsection (b). See Hinckley, 550 F.3d at 932.

Sixth, and finally, our view of the scope of subsection (d) is informed by the way in which Congress chose to delegate authority to the Attorney General. The subsection provides that the Attorney General "shall have the authority" to determine the applicability of the requirements imposed by SORNA. 42 U.S.C. § 16913(d). It is thus apparent that the drafters eschewed the use of mandatory language (e.g., "shall determine") that would have compelled the Attorney General to make an affirmative determination

before the statute could be applied to any previously convicted sex offender. In its use of permissive language, subsection (d) differs from other SORNA provisions in which Congress mandated action by the Attorney General. See, e.g., id. § 16917(b) (directing that "the Attorney General shall prescribe rules for the notification of sex offenders"). Congress's decision to couch some provisions of the statute in mandatory language but to couch subsection (d) in discretionary language is a telltale sign.[4] See Duncan v. Walker, 533 U.S. 167, 172-74 (2001). We think that this language says what it means and means what is says: that the Attorney General does not have to act before SORNA's registration requirements become effective as to previously convicted sex offenders. See Shenandoah, 595 F.3d at 157-58.

Congress obviously knew how to direct action by the Attorney General and how to give discretionary authority to him. In drafting subsection (d), Congress chose the latter course. We regard this choice as deliberate and, thus, as favoring a reading of subsection (d) as a grant to the Attorney General of discretion

---

[4] We note that the phrase "shall have the authority" is typically used, elsewhere in the United States Code, to denote a grant of authority to perform a discretionary act. See, e.g., 6 U.S.C. § 112(b)(2) (stating that Secretary of Homeland Security "shall have the authority to make contracts"); 12 U.S.C. § 3907(a)(2) (stating that federal banking regulators "shall have the authority" to set minimum capital requirements); 16 U.S.C. § 459j-2(d) (stating that Secretary of the Interior "shall have the authority" to condemn property); see also Cain, 583 F.3d at 427-30 (Griffin, J., dissenting) (cataloguing judicial interpretations of similar discretionary provisions).

-17-

to provide limited relief from the broad requirements imposed by SORNA in order to account for problematic permutations that might arise with respect to some previously convicted sex offenders.

These lampposts light the path that we must follow. The language, structure, and purpose of subsection (d) and the context in which it operates combine to show its unambiguous meaning. We hold that, in framing subsection (d), Congress did not contemplate a statutory scheme in which the application of the general rules limned in subsections (a), (b), and (c) to previously convicted sex offenders would hinge on action by the Attorney General.[5]

For purposes of the case at hand, this holding gets the grease from the goose. It teaches that the general rules requiring updates to sex offender registration took effect when SORNA was signed into law. Those requirements were thus in full force when, in February of 2007, the defendant traveled to a new state. When he failed to register there, he violated federal law. His prosecution for that offense poses no Ex Post Facto concerns.[6]

---

[5] The interim rule promulgated by the Attorney General indicates that this interpretation is correct. It states that "[t]his rule forecloses" claims that the Attorney General must first act before SORNA applies. 72 Fed. Reg. at 8896 (emphasis supplied).

[6] The defendant argues only that his prosecution under SORNA violated the Ex Post Facto Clause because it penalized him for conduct (interstate travel) that occurred prior to the date that SORNA applied to him. He does not raise the related, but distinct, claim that the overall applicability of SORNA presents an Ex Post Facto Clause problem because SORNA imposes punishment for a preexisting crime. We therefore do not address this second issue

## B. **Other Claims**.

The defendant advances two other arguments. First, he maintains that Congress lacked power under the Commerce Clause to enact sex offender registration requirements. Second, he asseverates that his conviction infringes his rights under the Due Process Clause because it was impossible for him to comply with SORNA at the time of his interstate travel.[7] We address these arguments separately, mindful of our obligation to review constitutional challenges de novo. United States v. Volungus, 595 F.3d 1, 4 (1st Cir. 2010).

**1. Commerce Clause**. The Commerce Clause provides in pertinent part that "[t]he Congress shall have Power To . . . regulate Commerce . . . among the several States." U.S. Const. art. I, § 8. The Supreme Court has described the extent of Congress's power to legislate under the Commerce Clause as follows:

> [W]e have identified three broad categories of activity that Congress may regulate under its commerce power. First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to

---

here.

[7] In supplemental briefing, the defendant tried to raise a further argument: that the Attorney General's promulgation of the interim rule violated the Administrative Procedures Act, 5 U.S.C. § 553. This argument was available to the defendant when he filed his opening brief (indeed, he made it below), so it falls within the familiar rule that issues not advanced in an appellant's opening brief are deemed waived. See United States v. Vázquez-Rivera, 407 F.3d 476, 487-88 (1st Cir. 2005); Sandstrom v. ChemLawn Corp., 904 F.2d 83, 87 (1st Cir. 1990).

> regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

United States v. Lopez, 514 U.S. 549, 558-59 (1995) (internal citations omitted).

Keying to this test, the defendant launches an as-applied challenge. He argues that SORNA does not regulate the channels or instrumentalities of, persons in, or activities having a substantial effect on, interstate commerce. See, e.g., United States v. Morrison, 529 U.S. 598, 608-09, 613 (2000); Lopez, 514 U.S. at 558-59. This argument fails because SORNA, as applied here, explicitly regulates the use of the channels of, and persons in, interstate commerce. Interstate travel is, after all, an express element of the SORNA violation with which the defendant was charged and of which he stands convicted. See 18 U.S.C. § 2250(a)(2)(B). That is all that is needed to satisfy the Lopez standard. See United States v. Guzman, 591 F.3d 83, 89-91 (2d Cir.), cert. denied, 130 S. Ct. 3487 (2010); Shenandoah, 595 F.3d at 160-61; United States v. Zuniga, 579 F.3d 845, 850 (8th Cir. 2009) (per curiam), cert. denied, 130 S. Ct. 3384 (2010). Given the presence of this element, the statute has a sufficient nexus to

-20-

interstate commerce to survive the defendant's Commerce Clause challenge.[8]

2. **Due Process**. The defendant's final argument is state-specific. He contends that because Rhode Island had not "implemented" SORNA at the time that he traveled interstate, he could not have complied with the law's registration requirements. Therefore, his conviction trespasses upon his right to due process.

We need not tarry. Although this "impossibility" argument is new to us in this context, it has been uniformly rejected elsewhere. See, e.g., United States v. Hester, 589 F.3d 86, 92 (2d Cir. 2009) (per curiam), cert. denied, 130 S. Ct. 2137 (2010); United States v. Griffey, 589 F.3d 1363, 1366 (11th Cir. 2009) (per curiam), cert. denied. 130 S. Ct. 3290 (2010); United States v. Gould, 568 F.3d 459, 463-65 (4th Cir. 2009), cert. denied, 130 S. Ct. 1686 (2010). We join that queue, pausing only to offer a decurtate statement of our reasoning.

SORNA contains commands aimed at two different audiences: convicted sex offenders and states. Convicted sex offenders must register. See 42 U.S.C. § 16913. States must take various steps,

---

[8] The defendant suggests that the registration requirement contained in 42 U.S.C. § 16913 itself exceeds Congress's power under the Commerce Clause. This suggestion is incorrect. The Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18, provides Congress with ample authority to regulate local activity as part of a general scheme regulating interstate commerce. See, e.g., Guzman, 591 F.3d at 91; United States v. Whaley, 577 F.3d 254, 260-61 (5th Cir. 2009); United States v. Ambert, 561 F.3d 1202, 1211-12 (11th Cir. 2009); see also Volungus, 595 F.3d at 5-6.

such as maintaining a jurisdiction-wide sex offender registry, enacting criminal penalties for failures to register, and sharing information with other registries. See, e.g., id. §§ 16912(a), 16913(e), 16921(b). A state's failure to take these steps may lead to a loss of federal funds. See id. § 16925(a); Gould, 568 F.3d at 463 n.1. Of critical importance, however, the registration requirements for sex offenders are neither conditioned on nor harnessed to state implementation of SORNA's state-directed mandates.

In any event, by the time that Congress enacted SORNA, every state had a sex offender registration law in place. See Smith v. Doe, 538 U.S. 84, 90 (2003). SORNA's registration requirements do not contemplate a specific type of registration; they merely require a sex offender to "register . . . in each jurisdiction where the offender resides." 42 U.S.C. § 16913(a). Registration in accordance with a preexisting state sex offender registration law satisfies SORNA. See Griffey, 589 F.3d at 1366 (collecting cases).

This construct makes good sense given SORNA's office as a mechanism for identifying sex offenders who otherwise might slip through the cracks and elude state-by-state registration requirements by moving across state lines. See 42 U.S.C. § 16901; see also National Guidelines for Sex Offender Registration and Notification, 73 Fed. Reg. 38,030, 38,030 (July 2, 2008)

(explaining that SORNA was enacted to "eliminate potential gaps and loopholes under the pre-existing standards by means of which sex offenders could attempt to evade registration requirements"). The result is that, as long as a state maintains a registration mechanism for sex offenders, what the state does or does not do with respect to implementing its state-specific obligations under SORNA is not relevant to a sex offender's obligation to register. See Gould, 568 F.3d at 465.

This dichotomy creates no unfairness here. Although Rhode Island may not have fully complied with its responsibilities under SORNA at the time of the defendant's federal crime, it did maintain a sex offender registry. The defendant could — and should — have registered there, as local police directed him to do. It follows that there was no due process violation.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, we uphold the district court's well-reasoned refusal to dismiss the indictment.

**Affirmed**.

**- Concurring Opinion Follows -**

**BOUDIN**, **Circuit Judge**, **concurring**. Judge Selya's decision for the panel lays out lucidly the reasons why the statutory language and canons of construction--always the first resort in interpretation--support applying the statute to the defendant. It may be useful to underscore two further points: that the statute's design leans against the narrow reading adopted by several other circuits and that Congress' purpose supports the broader one that we adopt today.

National standards for sex offender registration have existed since 1994, when the Congress provided federal funding to states that enacted sex offender registration laws. See 42 U.S.C. § 14071. By the time that the Sex Offender Registration and Notification Act (SORNA), Pub. L. No. 109-248, tit. I, 120 Stat. 590 (42 U.S.C. § 16901 et seq.), was signed into law on July 27, 2006, every state--including Massachusetts and Rhode Island--had enacted a sex offender registration law. See National Guidelines for Sex Offender Registration and Notification, 73 Fed. Reg. 38,030, 38,030 (July 2, 2008); see also Smith v. Doe, 538 U.S. 84, 90 (2003).

But the pre-SORNA state-by-state schemes contained potential gaps and loopholes through which sex offenders could attempt to evade registration requirements or the consequences of registration violations. See H.R. Rep. No. 109-218, pt. 1, at 23. Senator Cantwell explained: "Child sex offenders have exploited

-24-

this stunning lack of uniformity, and the consequences have been tragic. Twenty percent of the Nation's 560,000 sex offenders are 'lost' because State offender registry programs are not coordinated well enough." 152 Cong. Rec. S8020 (daily ed. July 20, 2006). SORNA's aim, repeated throughout the debate in Congress, was to impose on this patchwork a uniform, "comprehensive" federal registration statute. See 42 U.S.C. § 16901; see also United States v. Hinckley, 550 F.3d 926, 947 (10th Cir. 2008) (Gorsuch, J., concurring).

SORNA pressed states--on pain of losing federal funding--to adopt new federal standards in their own sex offender registration programs. 42 U.S.C. § 16925. In addition, it directly imposed new federal registration obligations on sex offenders and provided for federal enforcement of those obligations. 42 U.S.C. §§ 16913-16917. What is important to the case before us is that Congress intended the enforcement provisions to apply of their own force to those who had previously been convicted and not just to newly convicted offenders.

The House Judiciary Committee report on an earlier version of SORNA explained that SORNA would address the "strong public interest in finding" previously convicted offenders who were not currently registered "and having them register with current information to mitigate the risks of additional crimes against children." H.R. Rep. No. 109-218, pt. 1, at 24. Similarly,

Senator Kyl explained: "There currently are over 100,000 sex offenders in this country who are required to register but are 'off the system.' They are not registered. The penalties in this bill should be adequate to ensure that these individuals register." 152 Cong. Rec. S8025 (daily ed. July 20, 2006) (emphasis added); accord id. at S8013 (Sen. Hatch).

Consonantly, the SORNA provision on registry requirements for sex offenders has a single opening paragraph, titled "In general," that directs all "sex offender[s]" to register and to keep their registration current, 42 U.S.C. § 16913(a), and SORNA defines the term sex offender as "an individual who was convicted of a sex offender," id. § 16911(1) (emphasis added). Subsection (a), without exempting offenders with convictions before SORNA came into force, provides in full:

> A sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student. For initial registration purposes only, a sex offender shall also register in the jurisdiction in which convicted if such jurisdiction is different from the jurisdiction of residence.

Id. § 16913(a).

The provision, central to achieving SORNA's objectives, is manifestly remedial in purpose--not punitive. This is borne out by the evident reason for requiring registration in the first place, which is to prevent further crimes, by the statements in

-26-

Congress to the same effect, and by the placement of the registration provisions in 42 U.S.C. rather than the Criminal Code, 18 U.S.C. There is no presumption against or prohibition on making remedial measures apply to preexisting circumstances. See Smith, 538 U.S. 84.

SORNA also adopted criminal enforcement provisions, one of which punishes someone who after SORNA was enacted travels in interstate commerce but fails to register in a new state of residence within a fixed period. 18 U.S.C. § 2250(a); 42 U.S.C. § 16913; see Carr v. United States, 130 S.Ct. 2229 (2010). Here, DiTomasso--previously registered in Massachusetts as a sex offender--traveled in interstate commerce after July 27, 2006, and then failed to register in Rhode Island even though expressly advised of his obligation to register.

At this point, one might wonder why there is any problem at all with DiTomasso's conviction. The problem arises because in SORNA, Congress adopted not only the blanket requirement of subsection (a), but also a more detailed provision dealing with initial registration (subsection (b)); and a provision titled "Initial registration of sex offenders unable to comply with subsection (b)" (subsection (d)). The latter, drafted in language somewhat opaque at first, reads:

> (d) Initial registration of sex offenders
> unable to comply with subsection (b)

The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before July 27, 2006 or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b).

42 U.S.C. § 16913(d).

Since both the heading and the main internal cross reference in the text--"offenders who are unable to comply with subsection (b)"--relate to subsection (b), one could read subsection (d) as confined to certain problems, mainly dealing with timing, that Congress foresaw as to initial registration.[9] But there is also some evidence that might support subsection (d) as allowing the Attorney General to qualify the blanket applicability of subsection (a) itself if special problems arose in applying the statute to pre-SORNA convicts.

Yet if subsection (d) were read to apply to matters other than initial registration, it still does not say that SORNA exempts those convicted before SORNA unless and until the Attorney General so determines. It is perfectly fair to read subsections (a) and (d) together so that--absent contrary action by the Attorney

---

[9]Importantly, state initial registration requirements, varying from one state to another, could in various circumstances have made it infeasible for those convicted prior to SORNA to have registered in the manner and within the time limits now prescribed by SORNA's subsection (b) requirements. See Interim Rule on the Applicability of SORNA, 72 Fed. Reg. 8894, 8896 (Feb. 28, 2007) (codified at 28 C.F.R. § 72.3).

General--SORNA applies to one convicted before SORNA but who "travels" afterwards and refuses to register. That is the way the Attorney General himself reads the statute.[10] See Applicability of SORNA, 72 Fed. Reg. 8894 (Feb. 28, 2007) (codified at 28 C.F.R. § 72.3).

A contrary reading would suppose that Congress left those with pre-SORNA convictions free from registration requirements unless and until the Attorney General got around to regulating; in principle, such a reading would allow him not to regulate them at all. This is hardly consistent with Congress' emphatic purpose to advance the "strong public interest in finding" and imposing registration requirements on those already convicted before SORNA itself.

Some very capable judges appear initially to have viewed the matter differently, but, with respect, there is nothing in text or history that forbids reading subsection (a) as fully applicable unless and until the Attorney General limits or qualifies it so far

---

[10]In certain circumstances, the reading of an official charged with administering an ambiguous statute is entitled to substantial deference so long as it is linguistically permissible, see Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984); in other circumstances, it has persuasive force, see Skidmore v. Swift & Co., 323 US. 134, 140 (1944). In Carr, the Supreme Court rejected the Attorney General's reading of a separate SORNA provision, but there, the statutory term in issue--"travels"--did arguably directly conflict with the Attorney General's reading. Here, "authority to specify" says nothing express about whether the subsection (a) operates with full force if the Attorney General declines to exercise his authority.

as subsection (d) might permit; and, even if the language could read either way, this is the reading most consistent with Congress' central purpose.